# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>v.<br><br>Sergio Sanchez-Ochoa,<br><br>    Defendant. | CR-16-02213-TUC-RCC (JR)<br><br>**REPORT & RECOMMENDATION** |

    Pending before the Court is Defendant Sergio Sanchez Ochoa's Motion to Suppress Post-Arrest Statements for Miranda Violation (Doc. 32).[1] The Government filed a Response (Doc. 35). The Defendant did not reply. Defendant is charged with one count of Illegal Reentry, in violation of 8 U.S.C. § 1326 and enhanced by 8 U.S.C. § 1326(b)(1). (Doc. 7 (Indictment)). In his motion, Defendant seeks the suppression of his post-arrest statements obtained in violation of *Miranda* at the time of his arrest on November 1, 2016.

    Pursuant to LRCrim. 5.1(a), this matter was referred to Magistrate Judge Rateau for an evidentiary hearing and a report and recommendation. On July 26, 2017 (Doc. 50 (transcript)) the Court conducted an evidentiary hearing.[2] The Government called two

---

[1] The plea deadline is August 18, 2017 and the jury trial is set for September 6, 2017 (Doc. 40).

[2] The July 26, 2017 transcript is cited as "Tr." followed by the page number on which the cited testimony appears.

witnesses, United States Border Patrol Agents Bryan Bencic and Zachary Phillips. Eight exhibits were admitted into evidence. Based on the pleadings, testimony, exhibits and arguments of counsel, the Court recommends that the District Court, after its independent review, grant in part and deny in part Defendant's motion.

**I.      Hearing Testimony**

On November 1, 2016 at approximately 9:00 a.m., Border Patrol Agents Bryan Bencic and Zachary Phillips, who were working with Border Patrol Agents Lee Fullhart, and Daniel Halbleib, were notified of a sensor activation in Bates Well, which is approximately 15-20 miles north of the Mexico border. Tr. 5-7, 25-26, 49; Gov. Ex. 1 (aerial photograph of Bates Well area). The group traveled in their vehicles to the area of the sensor and then proceeded to the Bates Well rescue beacon. Tr. 6, 8; Gov. Ex. 5 (photograph of beacon). When they arrived at the beacon, they parked their vehicles and split into two groups. Tr. 7-9, 49. Agents Bencic and Halbleib proceeded south on foot to a hill on the north side of Growler Canyon looking for foot sign. Tr. 7-9, 27-28. Agents Phillips and Fullhart went another way so they could cover more area. Tr. 50.

After Agents Bencic and Halbleib found some foot sign and then lost it, a Border Patrol helicopter arrived and found some foot sign in a wash located north of the agents' location. Tr. 9, 50-51. All four agents ran to the location the helicopter was hovering over and picked up the foot sign as the helicopter flew farther north. Tr. 9, 29, 51. After flying about ½ mile north, the helicopter called out that there were four people on its right side. Tr. 9. As Agents Bencic and Halbleib ran toward the location of the helicopter, they saw the four individuals begin to flee. Tr. 10, 32; Gov. Exs. 2, 3 (photographs of area). The agents gave chase and one of the individuals, later identified as Defendant Sanchez-Ochoa, stopped running and was detained and handcuffed by Agent Halbleib. Tr. 10. Agent Bencic stayed with the Defendant and Agent Halbleib left to pursue the other subjects. Tr. 11.

After searching the immediate area around where his hands were handcuffed, Agent Bencic conducted a "pre-immigration inspection" of Defendant. Tr. 11. The agent

asked the Defendant what county he was a citizen of, to which Defendant responded, "Mexico." Tr. 12-13. Agent Bencic then asked if he and any documents to be in the United States legally, and Defendant told him he did not. Tr. 12-13. The agent then asked him how many people were in the group and the Defendant told him that there were four, but that one more individual had been left behind the night before in the mountains. Tr. 12. After asking him those questions, Agent Bencic began walking the Defendant down a hill. When they reached the bottom of the hill, another individual appeared from the brush with his hands in the air. Tr. 14. Agent Bencic placed handcuffs on him and conducted the same immigration inspection that he had with the Defendant. Tr. 14. The three then began walking back toward the road and in English the Defendant asked Agent Bencic how the agents knew they were in the area, if there were cameras or sensors in the area, and what the blue water jug and rescue beacons were used for. Tr. 14-15, 26; Gov. Exs. 4 (blue water barrel), 5 (rescue beacon). Agent Bencic responded that the helicopter had located him and that the beacons were for those who were in distress in the desert. Tr. 15-16. When the group reached the road, they continued westbound for about ¼ to ½ mile toward where the vehicles were parked at the beacon. Tr. 16, 53. On their way, they met up with Agent Phillips. Tr. 16, 52.

Once the group arrived back at the vehicle, Agent Fullhart contacted Agent Bencic by radio and requested that Agent Bencic drive to Agents Fullhart and Halbleib's location and pick up the two individuals they had apprehended. Tr. 16-17, 53-54. Agent Bencic left Agent Phillips with the Defendant and the other individual they had apprehended and proceeded to Agent Fullhart's location to pick up the other two apprehended individuals. Tr. 17. While Agent Bencic was gone, the Defendant, speaking in English, asked Agent Phillips how the agents had discovered them and if they had triggered a sensor. Tr. 54. Agent Phillips told the Defendant that the helicopter had seen them. Tr. 55.

After he picked up the men, Agent Bencic returned to the location at the rescue beacon and began completing field paperwork. Tr. 17, 55. Agents Bencic and Phillips then began completing the I-826 Field Processing Forms and Agent Phillips asked

Defendant, who was still handcuffed, for his name, date of birth, citizenship, place of birth, parents' names, and where and when he had crossed into the United States. Tr. 56-57, 60-64, 67-69; Def. Ex. 3 (identifying Agent Phillips as the "Field BPA" by his star number, A430). The Defendant answered all the questions and his responses were recorded on the I-826. Tr. 57-58; Def. Ex. 3. The agents then turned over the Defendant to other agents to complete processing. Tr. 41

Subsequently, on November 3, 2016, Agent Phillips prepared a report that summarized his involvement in the case. Tr. 57. That same date, Agent Bencic prepared a report summarizing his actions. Tr. 17-18, 22; Def. Ex. 1 (report). Agent Bencic's initial report did not reflect that the agent had asked Defendant immigration questions during their initial encounter in the field. Tr. 18. The agent did include that information in a subsequently prepared addendum to the report which was prepared on June 27, 2017 at the request of the prosecution team. Tr. 18, 22-23, 24-25; Def. Ex. 2 (addendum).

**II. Discussion**

The Defendant contends that the statements he made after his apprehension by Border Patrol agents are subject to suppression because they were the product of a pre-*Miranda* custodial interrogation. While much of the questioning at issue here was covered by the booking exception, the Court agrees that the agents went beyond the questioning allowed related to booking and asked questions that were likely to elicit incriminating responses.

**A. Initial Encounter**

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). An officer may conduct an investigatory stop if he has a reasonable and articulable suspicion that a suspect has committed a criminal offense. *Id*. As is relevant here, when a Border Patrol agent has reasonable and articulable suspicion that an individual has entered the United States illegally, the agent may briefly stop the individual and inquire into his citizenship and immigration status. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975). Such

a stop must "last no longer than is necessary to effectuate the purpose of the stop, *id*., and the agent must diligently pursue the investigation to quickly confirm or dispel his suspicions, *United States v. Sharpe*, 470 U.S. 675, 686 (1985). When an encounter is a *Terry* stop, rather than an arrest, *Miranda* warnings are not necessarily required. *See United States v. Basher*, 629 F.3d 1161, 1166-67 (9th Cir. 2011).

In *United States v. Cervantes-Flores*, 421 F.3d 825 (9th Cir. 2005), the defendant ran into the desert after seeing a marked Border Patrol vehicle. The Border Patrol agent chased the defendant for approximately ¾ of a mile and apprehended the defendant. The agent handcuffed the defendant and asked him his citizenship, whether he had immigration documents allowing him to be in the United States, and how he crossed the border. The defendant admitted he was a citizen of Mexico and had entered the United States illegally. *Id*. at 828.

The *Cervantes-Flores* court found that the agent had reasonable suspicion to stop the defendant because he was "walking along a highway known to be a smuggling route approximately 40 miles north of the United State border" and the defendant, upon seeing the agent, "immediately turned and attempted to flee." *Id.* at 829. The court determined that the situation established reasonable and articulable suspicion to make a *Terry* stop and the court held that the agent could ask the defendant questions "about his place of birth, his citizenship, whether he had permission to be in the United States and how he had crossed into the United States." *Id*. at 830.

Here, as in *Cervantes-Flores*, the Defendant was in an area that is indisputably well-known for illegal entry and narcotics smuggling and the agents were responding to a sensor activation indicating activity in the area. Upon being sighted by Border Patrol agents, the Defendant's group attempted to flee, but soon surrendered. At that point, Agent Bencic did not believe he had probable cause to arrest the Defendant, Tr. 33, but he was clearly entitled under *Terry* to ask the Defendant questions that were "reasonably related in scope to the justification for their initiation." *Terry*, 392 U.S. at 29. Agent Bencic initially asked the Defendant what country he was a citizen of and whether he and

any documents to be in the United States legally. Tr. 12-13. These questions were proper under *Cervantes-Flores*.

Moreover, that the Defendant was handcuffed by Agent Halbleib did not convert the *Terry* stop into a custodial arrest. "Handcuffing a suspect does not necessarily dictate a finding of custody." *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981). Evaluating the similar chase that occurred in *Cervantes-Flores*, the Ninth Circuit noted that it increased the risk to the agent and demonstrated an intention to evade arrest. *Cervantes-Flores*, 421 F.3d at 830. Those same considerations are present in the instant case and the risk factor was increased by the presence of multiple individuals and by the fact that Agent Bencic was alone with the Defendant. Thus, the agents' use of handcuffs was justified.

These findings, however, do not entirely resolve the evaluation of Agent Bencic's initial questioning of the Defendant. Agent Bencic also asked the Defendant how many people were in the group. Tr. 12. This question is not among those identified as proper in *Cervantes-Flores*. Nevertheless, as the Government contends, even if a suspect is under arrest, the "public safety" safety exception allows officers to "ask questions reasonably prompted by a concern for the public safety." *New York v. Quarles*, 467 U.S. 649, 656 (1984). For the public safety exception to apply, the Court must "ask whether there was an objectively reasonable need to protect the police or the public from any immediate danger." *United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994) (quotation marks omitted); *see also United States v. Brady*, 819 F.2d 884, 887-88 (9th Cir. 1987) (applying public safety exception to a question whether defendant had a gun in his car because the officer "had to control a dangerous situation" in which a crowd had gathered and the defendant's car "stood with its door open and the keys in the ignition"). Such circumstances existed here. When Agent Bencic asked the Defendant how many others were in his group, the situation remained volatile because an unknown number of individuals had yet to be apprehended. Knowing how many additional individuals were still at large enabled the agents to evaluate the risk they had encountered and to remain

vigilant until all the individuals were accounted for. As such, the question from Agent Bencic was not intended to elicit testimonial evidence, but was motivated by a pressing need to ensure the safety of the agents. *See United States v. Brady*, 819 F.2d 884, 888 n. 3 (9th Cir. 1987). Moreover, as Agent Bencic noted, the Defendant told him that there were four in the group, but that one more individual had been left behind the night before in the mountains. Tr. 12. Thus, the safety of the individual left behind also justified Agent Bencic's questions. Accordingly, the Defendant's responses to Agent Bencic's questioning in the field is not subject to suppression.

**B.      Defendant's In Custody Statements**

**1.      Custodial Interrogation**

"Pursuant to *Miranda v. Arizona*, a person has a right to the assistance of counsel during custodial interrogations." *United States v. Foster*, 227 F.3d 1096, 1002 (9th Cir. 2000). Before a person is questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way," he must first be warned that he has the right to remain silent, that any statements he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed. *Miranda v. Arizona*, 384 U.S. 436, 467-68(1966).

Determining whether a suspect is "in custody" for purposes of *Miranda* requires application of an objective test; it depends on the objective circumstances of the interrogation and not on the subjective views of either interrogating officers or the person being questioned. *J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2402 (2011); *Yarborough v. Alvarado*, 541 U.S. 652, 662–63 (2004). Under this test, two inquiries are made: (1) what were the overall circumstances surrounding the interrogation; and (2) given those circumstances, would a reasonable person in the suspect's situation have felt free to terminate the interrogation and leave. *Thompson v. Keohane,* 516 U.S. 99, 112 (1995*).* The Ninth Circuit has identified several factors that are useful in evaluating the circumstances surrounding the question of custody. These include: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at

any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008).

In the present case, it is undisputed that no *Miranda* warnings were given to the Defendant during his initial encounter with agents in the desert or prior to the questioning related to the completion of the I-826 Field Processing form. The testimony of the agents establishes that there were four agents and a helicopter pursuing the Defendant and the others with him. The agents on the ground were uniformed and armed and as soon as he was detained, the Defendant was handcuffed. As such, as soon as the Defendant provided incriminating responses to Agent Bencic's initial immigration questions, the Defendant was under arrest and no reasonable person would have believed they were free to leave. From that point forward, the Defendant could not be interrogated without the benefit of *Miranda* warnings.

"The term 'interrogation' means 'any words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.'" *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). During their walk back to the agents' vehicles, the Defendant initiated conversation with Agent Bencic related to how the agents located the Defendant and his group. The Defendant also initiated a similar conversation with Agent Phillips while at the vehicles. However, this interaction does not meet the definition of an interrogation. There is no evidence indicating that the Defendant's questions were the result of any "words or actions" that the agents "should have known were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 302. Volunteered statements like those made by the Defendant "are not barred by the Fifth Amendment and their admissibility is not affected by [*Miranda*]." *Id*. at 300 (quoting *Miranda*, 384 U.S. at 478). As such, the Defendant's questions to the agents are not subject to suppression.

### 2. Booking Exception

The final group of questions at issue in this motion are those asked by Agent Phillips when he was completing the I-826 Field Processing Form. Agent Phillips asked Defendant for his name, date of birth, citizenship, place of birth, parents' names, and where and when he had crossed into the United States. Tr. 56-57, 60-64, 67-69; Def. Ex. 3. The Defendant answered all the questions and his responses were recorded on the I-826. Tr. 57-58; Def. Ex. 3. The Government contends that these questions do not constitute interrogation under the "booking exception" to *Miranda*. Under the booking exception, the "routine gathering of background biographical information, such as identity, age, and address, usually does not constitute interrogation." *Innis*, 446 U.S. at 301; *see also United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2002).

The booking exception is not without limitations, however. "Seemingly routine biographical questions can constitute interrogation if, in light of all the circumstances, the officers should have known that their words or actions were reasonably likely to elicit an incriminating response." *United States v. Zapien*, 861 F.3d 971, 975 (9th Cir. 2017) (citing *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981)). "Thus, for example, when there is reason to suspect that a defendant is in the country illegally, questions regarding citizenship do not fall under the booking exception—even if they are biographical – because a response is reasonably likely to be incriminating." *United States v. Williams*, 842 F.3d 1143, 1147 (9th Cir. 2016) (citations omitted).

After Agent Bencic had obtained the Defendant's initial statement admitting that he was in the country illegally, the Defendant, even if he was not formally informed, was under arrest. However, despite being in custody and being escorted back to the agents' vehicles, he was not provided *Miranda* warnings prior to questioning by Agent Phillips. The questions contained in the I-826 and posed by Agent Phillips elicited potentially incriminating information about the Defendant's country of origin and when and where he entered into the United States. Tr. 57-58; Def. Ex. 3. Given that the Defendant is charged with illegal reentry after deportation, such questions constitute interrogation and

were reasonably likely to elicit incriminating responses. *Innis*, 446 U.S. at 302; *see also United States v. Disla*, 805 F.2d 1340, 1347 (9th Cir. 1986) (finding interrogation where officers knew that the questions related to an element of the crime). Consequently, other than statements made to confirm his name and identity, any statements made by the Defendant after he was taken to the agents' vehicles and questioned by Agent Phillips' in relation to the completion of the I-826 should be excluded at trial.

**III.    Recommendation**

Based on the foregoing, the Magistrate Judge recommends that the District Court, after an independent review of the record, GRANT IN PART AND DENY IN PART Defendant's Motion to Suppress Statements (Doc. 32).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment. However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. No replies are permitted without leave of court. If any objections are filed, this action should be designated case number: **CR 16-02213-TUC-RCC**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 11th day of August, 2017.

_____
Honorable Jacqueline M. Rateau
United States Magistrate Judge